UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JORDAN LEWIS DUNN,

               Petitioner,                  Case No. 1:17-cv-1055

v.                                         Honorable Robert J. Jonker

SHIRLEE HARRY,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jordan Lewis Dunn is incarcerated with the Michigan Department of Corrections at the Michigan Reformatory (RMI) in Ionia, Michigan. Following a jury trial in the Ingham County Circuit Court, Petitioner was convicted of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a). On July 23, 2014, the court sentenced Petitioner to life imprisonment without the possibility of parole.

       On November 30, 2017, Petitioner, through his counsel, filed his habeas corpus petition. The petition raises five grounds for relief, as follows:

I.      The presumption of innocence is the first rock in the foundation of our rights as citizens of the United States. It is imperative that the due process rights of each citizen are honored. Part of that protection encompasses proper jury instructions. The jury in the instant matter did not receive proper jury instructions with regard to the consideration of lesser charges that were applicable in this case. Was the outcome of Mr. Dunn's trial tainted and unreliable due to this miscarriage of justice and was trial counsel ineffective for not requesting the proper instructions

II.     Every citizen accused of a crime has the right to effective assistance of counsel. This right is guaranteed by our Constitution and no one should face charges without the assistance of competent representation. During

Mr. Dunn's trial, there was testimony that was presented that indicated Mr. Dunn's actions were, in fact, the result of an accident that occurred in the heat of the moment.  Was trial counsel ineffective when he failed to request jury instructions on voluntary manslaughter and accident when testimony was presented to support these instructions and trial counsel argued these defenses during closing argument?

III.    Every person has the constitutional right to present a defense when accused of a crime.  Every person also has the constitutional right to be presumed innocent unless proven guilty, and the burden of proving guilt lies squarely on the shoulders of the government.  Each element of a crime must be proven beyond a reasonable doubt.  Premeditation is an element of first-degree murder.  In Mr. Dunn's case, there was insufficient evidence to prove premeditation on the part of Mr. Dunn.  Was Mr. Dunn wrongfully convicted due to the fact that there is insufficient evidence of premeditation or deliberate action?

IV.    Due process requires that the evidence used to convict a person at trial be fair and relevant.  Facebook posts claimed to have been made by Mr. Dunn were improperly admitted because they were not relevant, they were unfairly prejudicial, and they were not authenticated, and trial counsel was ineffective in not objecting to these posts.  Did allowing the Facebook posts into evidence prejudice the jury and thereby render the conviction unconstitutional and was trial counsel ineffective for not objecting to their admission?

V.    The right to cross-examination is fundamental and necessary to ensure the due process rights of every citizen.  While expert witnesses can offer opinions, these opinions must be based on accurate and reliable information.  Dr. Bechinski testified that Mr. Berlin's death was classified as a homicide because Mr. Dunn's actions were intentional.  This classification, however, was based solely on the hearsay statements of others.  Nothing in the injuries sustained by Mr. Berlin support the opinion that they were intentionally inflicted by anyone.  Was Mr. Dunn wrongfully convicted because the expert witness was allowed to offer an unsupported opinion for the jury's consideration and was trial counsel ineffective for not objecting to his opinion testimony?

(Pet., ECF No. 1, PageID.12-23.)  Respondent has filed an answer to the petition (ECF No. 6) stating that the grounds should be denied because they are without merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-

2

132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

### Discussion

I.    Factual allegations

On October 30, 2013, Petitioner, while driving through a mobile home park in Ingham County, collided with pedestrian Ben Berlin, killing him.  There were many witnesses to the collision.

The jury heard from Nicole Benn and Corey McCullough, who were riding in the vehicle with Petitioner.  (Trial Tr. III, ECF No. 7-7, PageID.580-604; Trial Tr. VII, ECF No. 7-11, PageID.717-727.)  The jury heard from Berlin's sons, Steven and Jordan (Trial Tr. III, ECF No. 7-7, PageID.612-624; Trial Tr. IV, ECF No. 7-8, PageID.641-650); Berlin's neighbors, Jaycen Glynn (Trial Tr. IV, ECF No. 7-8, PageID.626-641), Samantha Heier (*Id*., PageID.641-659), Earl Linnabary (*Id*., PageID.659-664), Peter Garrison (*Id*., PageID.664-671), and William Myers (*Id*., PageID.671-679); law enforcement personnel, Joshua Treat, Andy Daenzer, and Brady Delaney (Trial Trs. V & VI, ECF Nos. 7-9, 7-10);  and the forensic pathologist (Trial Tr. III, ECF No. 7-7, PageID.604-611).  The passengers in the truck, Berlin's sons, and Berlin's neighbors had all witnessed the incident.  The stories they told varied with regard to the some of the details, but the various accounts shared a common core set of facts.

It is not disputed that Petitioner drove into the mobile home park that evening with his friend Corey McCullough to pick up another friend, Nicole Benn.  Petitioner drove in fast and loud.  He disregarded the speed limit and stop signs.  He drew the attention and ire of park

residents.  Jaycen Glynn approached the vehicle as Corey exited to permit Nicole into the back seat.  He asked that Petitioner slow down.

As Petitioner headed toward the park exit, he promptly disregarded that request and continued to ignore posted speed limits and stop signs.  After Petitioner blew through one stop sign, Ben Berlin was standing by the side of the road.  He yelled at Petitioner to slow down.  He may have thrown in a couple of profanities for good measure.  Petitioner was already past Berlin he slammed on the brakes, threw the truck into reverse, and backed the truck up to a position a few feet away from, but pointed in the direction of, Berlin.

Several people stood nearby.  Berlin began to approach the truck.  There are discrepancies as to how close Berlin got, but it appears that Berlin continued to yell.  Petitioner held that position for some seconds, some said it was a few seconds, but at least one witness suggested it was more than 30 seconds.  Then, Petitioner stepped on the gas pedal—hard—and rammed into Berlin.  Berlin was thrown onto the hood and cracked his head on the windshield before the impact pushed him off the truck.

Petitioner sped away.  He returned to his house and tucked his truck away in the woods on the side of his house.

After a couple of weeks in the hospital, Berlin's family made the difficult decision to take him off life-support.  He died on November 11.

The prosecutor charged Petitioner with first-degree premeditated murder.  The jury was instructed with regard to that charge as well as lesser-included-offense charges of second-degree murder and involuntary manslaughter.  The jurors settled on first-degree murder.

The court sentenced Petitioner in accordance with the statutory mandate.

4

Petitioner attacked the judgment on two fronts. He moved for a new trial based, in part, on claims that his trial counsel had rendered ineffective assistance. With the assistance of counsel, he also appealed to the Michigan Court of Appeals raising the same issues he raises in this petition plus one additional issue based on the cumulative impact of the other errors. By opinion issued May 12, 2016, the appellate court rejected Petitioner's challenges to his conviction.

Petitioner then turned to the Michigan Supreme Court, again with the assistance of counsel. He filed an application for leave to appeal raising the same six issues he had raised in the court of appeals. That court denied relief on November 30, 2016. This petition followed one year later.

II.    AEDPA standard

This action is governed by the AEDPA. The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the

Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state

court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Jury Instructions (Habeas Issues I and II)

Petitioner raises two habeas challenges that relate to the jury instructions.  First, Petitioner contends the trial court confused the jury by instructing them that they had to unanimously find him not guilty of first-degree murder before they could deliberate regarding any lesser-included offenses.  Second, Petitioner claims that his counsel was ineffective for failing to request instructions on the defense of accident and voluntary manslaughter.

An understanding of Michigan's classification of homicides is helpful when analyzing the jury instructions in Petitioner's case.  In Michigan, murder is an intentional killing. First-degree murder is a statutory crime.   Mich. Comp. Laws § 750.316 identifies three circumstances that would raise an intentional killing to the level of first-degree murder: premeditated killing; felony murder; and the murder of a peace or corrections officer.  All other kinds of murder are second-degree murder.  Mich. Comp. Laws § 750.317.

In Michigan there is another "killing" crime know as manslaughter.  "[U]nder Michigan law, the difference between second-degree murder and [voluntary] manslaughter is that a manslaughter conviction requires the defendant to show, by a preponderance of the evidence, that he killed in the 'heat of passion,' with such passion caused by 'adequate provocation,' without 'a lapse of time during which a reasonable person could control his actions.'"   *Ruelas v.*

7

*Wolfenbarger*, 580 F.3d 403, 410 (6th Cir. 2009) (quoting *People v. Mendoza*, 664 N.W.2d 685, 690 (Mich. 2003)).  Michigan also recognizes another category of manslaughter, characterized as involuntary manslaughter.  "Under Michigan law, a homicide committed with the mens rea of malice is murder. . . . [a] homicide committed with the lesser mens rea of gross negligence or an intent only to injure is involuntary manslaughter." *McMullan v. Booker*, 761 F.3d 662, 668 (6th Cir. 2014) (citing *People v. Gillis*, 712 N.W.2d 419, 438 (Mich. 2006)).  Petitioner also claims that he offered evidence that the killing was accidental.  "Accident" is a defense to murder (first and second degree) and voluntary manslaughter; however, it is not a defense to involuntary manslaughter.  *People v. Hess*, 543 N.W.2d 332, 335-36 (Mich. Ct. App. 1995).

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The Due Process Clause requires that every element of the charged crime be proven beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).  When a jury is not properly instructed with regard to the elements of the charged crime, the due process right to proof beyond a reasonable doubt is implicated. *Sandstrom v. Montana*, 442 U.S. 510 (1979).  It is the prerogative of the state, however, to define the elements of the crime and the federal courts are bound by their

8

determination.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979) ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses.  Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. ").  It is also the prerogative of the state to determine what charge or charges to bring:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.  Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  *Oyler v. Boles*, 368 U.S. 448, 456.

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (footnote omitted).  Here, the prosecutor did not proceed to trial on any charge other than first-degree premeditated murder

Similarly, the Due Process Clause guarantees criminal defendants a meaningful opportunity to present a complete defense.  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Nonetheless, it is also the prerogative of the state to define whether or not a defense applies to a particular crime.  *See Foucha v. Louisiana*, 504 U.S. 71, 96 (1992) (acknowledging "the general rule that the definition of both crimes and defenses is a matter of state law . . . ."); *Gimotty v. Elo*, 40 F. App'x 29, 32 (6th Cir. 2002) ("States are free to define the elements of, and defenses to, crimes. . . . In determining whether a petitioner was entitled to a defense under state law, federal courts must defer to state-court interpretations of the state's laws . . . .").

9

Petitioner's challenges relate to lesser-included offenses.  The Due Process Clause requires providing lesser-included-offense instructions in <u>capital</u> cases.  *Beck v. Alabama*, 447 U.S. 625 (1980).  Lesser-included-offense instructions were also required in <u>noncapital</u> cases under the English common law and they are still required under the common law or by statute in every state and in the federal courts, if and when the evidence supports it.  *Id.* at 633-34, 636 n.11, 12.

Even though the courts of this nation are in complete accord as to the propriety of lesser-included-offense instructions, the Supreme Court has never held that lesser-included-offense instructions are required as a matter of constitutional due process in noncapital cases.  *Id.* at 638 n.14; *see also Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc) ("[The failure to instruct on lesser included offenses in noncapital cases [is not] such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]").  Thus, a state court's refusal to read a lesser-included-offense instruction cannot be contrary to, or an unreasonable application of, clearly established federal law.

Moreover, whether or not a particular crime is a lesser-included offense of a charged crime is a matter of state law.  *Richie v. Workman*, 599 F.3d 1131, 1136 (10th Cir. 2010) ("Whether an offense is a lesser-included offense is a matter of state law."); *see also Hopkins v. Reeves*, 524 U.S. 88, 95-99 (1998) (looking to state law to determine whether offenses were lesser-included offenses of charged crime and noting the various tests states employed to determine whether one offense was a lesser included offense of another).  The state court's determination on the issue would be "axiomatically correct[.]" *Bagby*, 894 F.2d at 795.

Finally, the Supreme Court has cautioned that courts must not "parse [jury instructions] too finely[;]" instead, they "must be evaluated not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 392 (1999).

Although the error at the heart of Petitioner's challenges is that the jury was not properly instructed, Petitioner argues that it is counsel's fault that the error was not corrected. Petitioner claims his trial counsel rendered ineffective assistance for failing to challenge the trial court's instructions regarding the progression of deliberation and for failing to propose and insist that the court instruct the jury regarding the defense of accident and the lesser-included offense of voluntary manslaughter.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court

determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Against that backdrop, Petitioner's specific challenges are addressed below.

## A.    Acquittal Before Consideration of Lesser-Included Offenses

Petitioner does not challenge the first-degree murder instructions, the second-degree murder instructions, or the involuntary manslaughter instructions except with respect to how the trial court told the jury to proceed from deliberating on any one of those crimes to the next.  Michigan case authority calls for starting deliberations with the charged crime; then, if the jurors acquit on that charge, or cannot agree to convict, they should proceed to deliberate on the next charge.  *Casnave v. Lavigne*, 169 F. App'x 435, 444-45 (6th Cir. 2006) (citing *People v. Handley*, 329 N.W.2d 710, 712 (Mich. 1982)).

At Petitioner's trial, the court's instructions were entirely consistent with *Handley*.  (Trial Tr. VII, ECF No. 7-11, PageID.749.)  As the court went on to explain the jury verdict form,

however, it opened the door to some confusion.  The jury verdict form stated: "If you decide that the defendant is guilty of 1st Degree Murder, you may stop your deliberations and return your verdict.  If you find that the defendant is not guilty of 1st Degree Murder, you may also consider the less serious crime of 2nd Degree Murder."  (Jury Verdict Form, ECF No. 8-1, PageID.1139.) The form omitted the possibility that the jurors could go from consideration of first-degree murder to consideration of second-degree murder (or involuntary manslaughter) if they could not agree on a verdict with respect to first-degree murder.  In explaining the form, the trial court omitted that possibility as well.  (Trial Tr. VII, ECF No. 7-11, PageID.749.)

The possibility of confusion was not simply theoretical.  During deliberations the jury presented the judge with the following question: "If we do not agree on a charge for first degree, and we do have a unanimous guilty verdict on a lesser charge, can we render a verdict on the charge we agree on?"  (Juror Question, ECF No. 7-15, PageID.916.)  The court's typewritten response—which repeated the question—answered "yes."  (Juror Question Response, ECF No. 7-15, PageID.917.)

Petitioner contends that the possible confusion rendered his trial unfair.  The Michigan Court of Appeals disagreed:

> Considering the instructions as a whole, we do not see error requiring reversal. Although, if viewed in isolation, the jury form and the court's explanation of the form did not impart all the information required by *Handley*, the trial court in fact gave the required *Handley* instruction, expressly stating that the jury could move to consideration of a lesser offense if they could not reach a unanimous verdict regarding the principal charge.  The form and the court's subsequent instructions regarding the form did not overtly contradict this clearly articulated point of law. That is, the verdict form and the court's additional comments were silent on what the jury should do if it could not agree on the principal charge, and thus there was no conflict with the court's earlier explicit instruction to move on to consideration of a lesser charge if the jury could not agree.[3] When considering the instructions as whole, the latter instructions simply explained the use of the verdict form, in particular the use of the "guilty" and "not guilty" check boxes which appeared on the form for each offense.  See generally *People  v  Wade*, 283 Mich App 462, 468;

13

771 NW2d 447 (2009) (holding that a jury verdict form has to give the jury the option of returning a general not guilty verdict or a not guilty verdict with regard to each offense).  In short, even if the form and the court's instruction thereon were imperfect on their own, when they are read in conjunction with the express *Handley* instruction, we see no basis for reversing defendant's conviction.

Indeed, even if the verdict form or the trial court's explanation of the form arguably created some confusion by implying that the jury could not move on to a lesser offense without first reaching a unanimous verdict on the principal charge, it is plain that the trial court later again clarified this point in response to a jury question, and a jury will not be presumed to have followed an incorrect instruction that has been corrected by the trial court.  See *People v Hardesty*, 139 Mich App 124, 132; 362 NW2d 787 (1984).  In particular, compliant with *Ha[n]dley,* the trial court responded "yes" when the jury asked: "If we do not unanimously agree on a charge for 1st degree, and we do have a unanimous guilty verdict on a lesser charge, can we render a verdict on the charge we agree on?"[4]  The trial court's response to the jury's question again made plain that the jury could consider a lesser charge before reaching a unanimous verdict on first-degree murder.  Consequently, defendant has not shown error entitling him to reversal, and he has not established his ineffective assistance of counsel claim.

[3] Cf. *Hess*, 214 Mich App at 36 (presuming the jury followed incorrect instruction when the jury was instructed that accident was a defense to manslaughter and also instructed that accident is not a defense to manslaughter).  See also *People  v  Clark*, 340 Mich 411, 418; 65 NW2d 717 (1954) ("Where conflicting instructions are given, one erroneous and the other correct, we must presume that the jury followed the erroneous instruction." (emphasis added)).

[4] Defendant contends that the jury's question evinces the fact that the jury reached a unanimous verdict regarding a lesser offense, but that they refrained from returning such a verdict because of their confusion over whether they had to reach a unanimous verdict on the principal charge before considering the lesser offenses.  However, the jury's question is plainly hypothetical, asking what they should do "if" they "do not unanimously agree on a charge for 1st degree, and we do have a unanimous guilty verdict on a lesser charge[.]"  Moreover, the jury went on to deliberate for several more hours after the trial court's affirmative response to their question, belying a claim that they had reached a verdict.  Indeed, if, at the time they posed their question, they had reached a verdict regarding a lesser offense without having reached a unanimous verdict on the principal offense, this fact would only demonstrate the jury's understanding of the concept that it was free to move on to deliberation of lesser offenses if it could not reach a unanimous verdict regarding the principal offense.

(Mich. Ct. App. Op., ECF No. 7-15, PageID.790-791.)

To the extent Petitioner's challenge depends on the trial court's failure to comply with state law, it is not cognizable on habeas review.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C.

14

§ 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 67-68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Moreover, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).  *See also Thomas v. Stephenson*, No. 16-2301, slip op. at 8 n.1 (6th Cir. Aug. 6, 2018) (same).  Thus, this Court is bound by the Michigan Court of Appeals determination that the instructions complied with Michigan law.

Other than his non-cognizable claims that the instructions violated state law, Petitioner fails to identify any error.  The instructions did not run afoul of any of the due process issues that the Supreme Court has identified with respect to instructional errors.  The state appellate court's factual findings with regard to the instructions and the jury's response are not only reasonable on this record, they are unassailable.  The court of appeals' legal determinations are in no way contrary to, or unreasonable applications of, clearly established federal law regarding jury instructions.  Accordingly, Petitioner cannot prevail on his habeas claim about the court's instructions regarding the proper progression through deliberations.

15

Moreover, because Petitioner's claims of state law instructional error and federal constitutional error have no merit, his counsel cannot be considered to be ineffective for having failed to raise them. Counsel's failure to raise a meritless issue does not constitute ineffective assistance. *See Sutton v. Bell*, 645 F.3d 752, 755 (6th Cir. 2011) ("Given the prejudice requirement, 'counsel cannot be ineffective for a failure to raise an issue that lacks merit.' "). "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Accordingly, Petitioner is not entitled to habeas relief on his ineffective assistance claim either.

### B.    Accident and Voluntary Manslaughter

Petitioner next contends that his counsel rendered ineffective assistance because he did not request a jury instruction regarding the defense of accident nor did he request an instruction regarding the crime of voluntary manslaughter. Counsel's failure to seek those instructions is noteworthy in that he argued that Petitioner acted in the heat of passion. (Trial Tr. VII, ECF No. 7-11, PageID.737-738) ("If anything, his actions were the result of passion, of anger brought about by adequate cause before he had a reasonable time to calm down."). Counsel also suggested that it was an accident that Petitioner hit Berlin with the truck. (*Id.*, PageID.743) ("Taken altogether, I think this was just an accident.").

Petitioner raised this issue in his motion for new trial. The trial judge indicated that he would not have read the voluntary manslaughter instruction:

> [I]f the Defense Counsel had required an instruction on voluntary manslaughter, the Court would have denied. The evidence of the record show that contrary to the Defendant's theory of trial, the Defendant appeared to be the person who provoked any confrontation with the people who lived at the mobile home park. The fact that the people at the park shouted to Defendant to slow down or the fact that Ben Berlin may have yelled, slow down, bitch, did not warrant a voluntary manslaughter instruction because provocation that consist only of words generally does not constitute adequate provocation.

16

Moreover, even though the testimony reflects that the incident happened quickly, the pause between slamming on the brakes, throwing the truck into the reverse, accelerating quickly toward Ben Berlin when the Defendant had an opportunity to go in a different route, I believe the testimony was he drove right at him, certainly would have given a reasonable person time to take a second look or cool down. Also, the two witnesses in the vehicle with the Defendant testified that he did not appear to be scared or heated in any way prior to striking Ben Berlin with his truck. Since the Court wouldn't have given the instruction even if it was requested, counsel was not ineffective for failing to make a futile request.

(Mot. Hr'g Tr., ECF No. 7-14, PageID.782.)  Similarly, with regard to the defense of accident, the

trial judge stated:

The law states that a criminal defendant is entitled to have a properly instructed jury consider the evidence against him.  The trial court may provide an instruction when the evidence presented at trial supports giving that instruction.  Jury instructions must fairly present the issues to be tried and sufficiently protect the Defendant's rights.  The Defendant asserting an affirmative defense must prove some evidence on all the [elements] of the Defense before the trial [court] is required to instruct the jury concerning that.

In this case, even if Defense Counsel would have requested it, the Court would not have given a defense of accidental—a defense of accident instruction because such an instruction was not supported by the evidence.  The Court did give an instruction on involuntary manslaughter and in accordance with Defendant's request but Defendant's conduct before, during and after hitting Ben Berlin[ with the] truck could not be construed with him not relying that his actions wouldn't cause death or great bodily harm.  Since the Court would not have given the instruction of the defense of accident, Counsel's request would have been futile and thus, Counsel was not ineffective for failing to make a futile request.

(*Id*., PageID.782-783.)

On appeal, the Michigan Court of Appeals echoed the trial court's conclusions. With regard to the voluntary manslaughter instruction, the appellate court noted, "a rational view of the evidence did not support the instruction . . . ."  (Mich. Ct. App. Op., ECF No. 7-15, PageID.791.)  Similarly, with regard to the accident defense instruction, the court of appeals wrote, "the instruction was not warranted because there was no evidence that defendant accidentally or inadvertently struck Berlin."  (*Id*., PageID.792.)

17

Petitioner has failed to show that the factual determinations of the trial court or the court of appeals—that there was no evidentiary support for the relevant instructions—were unreasonable.  This Court's review of the record demonstrates that those factual determinations were patently reasonable.  Because there was no evidentiary support for the instructions, it was not professionally unreasonable for counsel to forego requesting them.  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752. Accordingly, the state courts' rejection of Petitioner's ineffective assistance claims is neither contrary to, nor an unreasonable application of, *Strickland*, the clearly established federal law on this issue.

The Court notes further that counsel's failure to request the instructions is in no way inconsistent with counsel's arguing "heat of passion" or "accident" in closing.  Even if the evidence did not support specific jury instructions, counsel's questions of the witnesses throughout the trial raised those issues.  Both issues, with or without the instructions, call into question whether the prosecutor had established intent with the requisite certainty to warrant a verdict on first-degree or second-degree murder.  Despite counsel's attempt to plant these seeds of doubt, however, the jury concluded the prosecutor had met his burden with respect to Petitioner's intent to kill.

IV.    Sufficiency of the Premeditation Evidence (Habeas Issue III)

Petitioner next argues that the prosecutor's showing of premeditation was insufficient to warrant a finding that Petitioner was guilty of premeditated murder beyond a reasonable doubt.  A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. at 319, which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony,

to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied a standard identical to that announced in *Jackson*: "we examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt.'" (Mich. Ct. App. Op., ECF No. 7-15, PageID.785) (citation omitted). As *Jackson* commands, the appellate court then reviewed the evidence against the elements of the offense. With regard to the element of

premeditation, the court of appeals reasoned there was sufficient evidence in the record to support

the verdict:

> In this case, with regard to defendant's conduct before the killing, Benn testified that before defendant arrived to pick her up at about 7:30 p.m., she saw two posts on Facebook that were authored by "Sean Smoke," an alias used by defendant.  The first, dated October 30 at 6:37 p.m., stated, "I wanna kill."  The second, dated October 30 at 7:08 p.m., stated, "i prob wont be here im bout to go do sumthin stupid and ill b gone for awhile lol for reall see ya."  Although Berlin was not specifically mentioned as the target of defendant's intentions, it is reasonable to infer from the posts that—less than 90 minutes before striking Berlin with his pick-up truck—defendant was deliberating a killing as well as the possible consequences of such a crime and that he had in fact formed an initial homicidal intent.  See *Unger*, 278 Mich.App at 229; *People v. Eliason*, 300 Mich.App 293, 301; 833 NW2d 357 (2013).
>
> Shortly after posting about his deliberations, defendant then drove to the trailer park, where he drove dangerously through the park and ultimately acted upon his previously expressed desire to kill by using his truck as a weapon against Berlin.  That is, the facts and circumstances surrounding the killing itself support the conclusion that defendant acted with premeditation and deliberation.  Testimony shows that, after Berlin shouted, defendant could have continued driving, but he chose to stop his vehicle and to reverse.  According to McCulloch, after defendant reversed, 30 to 45 seconds passed before defendant drove his truck forward at Berlin.  Eyewitness testimony established that defendant aimed his truck at Berlin, driving directly at him or even turning to aim for Berlin.  McCulloch stated that defendant "floored it," Benn testified that defendant "gunned it," and other testimony confirmed that defendant quickly accelerated toward Berlin.  In other words, the evidence establishes that—after stopping, reversing, and pausing—defendant deliberately used his truck as a weapon, purposefully running Berlin down on the road.  The moments that passed as defendant stopped, reversed, and paused before driving forward were sufficient for him to deliberate about the action he would take and the consequences of it.  See *People v. Tilley*, 405 Mich. 38, 46; 273 NW2d 471 (1979) (concluding that an interval of a minute or less between procuring gun and firing was evidence of premeditation and deliberation).
>
> Additionally, defendant's conduct after the commission of the crime provides further circumstantial evidence of deliberation and premeditation.  Defendant not only fled the scene, but also later fled from the police when he encountered them outside his grandmother's house.  Evidence of flight can support an inference of guilt, and it was for the jury to determine whether the flight occurred under circumstances indicative of guilt.  *Unger*, 278 Mich.App at 226.  Additionally, a police officer testified that defendant's truck was found "kind of concealed by trees back by the bonfire."  Efforts at concealment after a killing, in this case attempting to hide what was essentially the murder weapon, can serve as evidence of premeditation and deliberation.  See *People v. Gonzalez*, 468 Mich. 636, 641; 664

NW2d 159 (2003); *People v. Haywood*, 209 Mich.App 217, 230; 530 NW2d 497 (1995).

Given all the facts and circumstances, viewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence of premeditation to sustain defendant's conviction of first-degree murder.

(Mich. Ct. App. Op., ECF No. 7-15, PageID.786-787.)

Petitioner does not attack the reasoning of the court of appeals.  He does not, with one exception, deny the presence in the record of the evidence upon which the state court relies. Petitioner claims the Michigan Court of Appeals was wrong when it said the record showed "the Mr. Dunn 'fled from the police when he encountered them outside his grandmother's house.'" (Pet'r's Habeas Br., ECF No. 1-1, PageID.70.)  The court of appeals had it right.  Deputy Andy Daenzer testified that Petitioner was not at his home, he was not at his girlfriend's mother's home, and he was not at Petitioner's grandmother's home when police arrived.  (Trial Tr. V, ECF No. 7-9, PageID.692-693.)  The deputy testified that, as he walked up to the house, a car pulled into the driveway, and then:

I shined my flashlight.  I could see who was in it.  I didn't recognize the driver.  But I had some dealings with Mr. Dunn.  I could see he was a passenger.  I yelled at the driver a couple of times to stop.  I could tell already that he put it in reverse, as I was walking up, probably six to ten feet away, and put it in reverse and took off east on Maple.

(*Id*., PageID.693.) Other deputies chased the vehicle with lights and sirens on.  (*Id*.)  They stopped the vehicle less than a mile from the house, but Petitioner fled on foot.  (*Id*.)  He was caught a few minutes later.  (*Id*.)  Therefore, the court of appeals' critical findings of fact—all of them—are well supported in the record.

Petitioner similarly does not contend that the verdict-supporting inferences identified by the appellate court are irrational.  And, he does not refute the court's assessment of what premeditation means under state law.  Instead, he asks this Court to do three things it cannot

21

do on habeas review:  (1) invade the province of the jury by selecting as credible the testimony of one witness over another; (2) view the evidence in a light that favors him; and (3) invade the province of the jury again by drawing inferences from the evidence.  Petitioner, essentially, asks the Court to ignore the *Jackson* standard.

There is no question that there is evidence in the record that would support a jury's determination that Petitioner did not act with premeditation and, therefore, could not be guilty of first-degree murder.  That is not the issue.  Viewed in a light most favorable to the prosecution, could a rational trier of fact find, beyond a reasonable doubt, that Petitioner's killing of Ben Berlin was premeditated?  The Michigan Court of Appeals concluded a rational trier of fact could make that finding.  Petitioner has failed to demonstrate that the court of appeals' conclusion is contrary to, or an unreasonable application of, *Jackson*.  Accordingly, he is not entitled to habeas relief on his sufficiency claim.

## V.    Admissibility of the Facebook Posts (Habeas Issue IV)

Petitioner claims that the Facebooks posts should not have been admitted into evidence for one of several reasons: (1) they were not properly authenticated, Mich. Rule Evid. 901; (2) they were not relevant, Mich. Rule Evid. 401; (3) their prejudicial effect substantially outweighed their probative value, Mich. Rule Evid. 403; (4) they were evidence of an "other bad act" with no proper purpose, Mich. Rule Evid. 404(b); and (5) they were hearsay, Mich. Rule Evid. 802.  (Pet'r's Br., ECF No. 1-1, PageID.72-74.)  Moreover, Petitioner argues his counsel was ineffective for not challenging the admission of the posts.

The Michigan Court of Appeals disagreed with Petitioner's analysis.  That court concluded that the posts were admissible under the Michigan Rules of Evidence.  That conclusion binds this Court.  *See Wainwright*, 464 U.S. at 84.  "[A] state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf*, 722 F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76).

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle*, 502 U.S. at 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders*, 221 F.3d at 860.

Petitioner has not met this difficult standard.  Indeed, the only Supreme Court authority Petitioner cites is *Lisenba v. California*, 314 U.S. 219 (1941), which might be interpreted to stand for the proposition that due process will not allow a criminal conviction based on the

introduction of a coerced confession—although the Supreme Court concluded the confession in that case was not coerced and, thus, was admissible.  The case says nothing about the evidence rule violations of which Petitioner complains.

This Court is bound by the state court's conclusion that the posts are sufficiently authentic under state law.  Nonetheless, if they were not, there is no Supreme Court authority holding that evidence like the printed-out copies of the Facebook posts are constitutionally inadmissible because of authenticity issues.  Nor are there any Supreme Court cases holding that such posts are constitutionally inadmissible based on relevance or prejudice grounds—even though this Court is bound by the state court's conclusion that the posts are relevant and more probative than prejudicial.

Petitioner's claim regarding the posts as inadmissible "other bad acts" is likewise unavailing.  There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

24

Similarly, Petitioner's contention regarding the due process implications of admitting hearsay evidence fails.  "The first and most conspicuous failing in [the petitioner's] petition is the absence of a Supreme Court holding granting relief on his due process theory: that the admission of allegedly unreliable hearsay testimony violates the Due Process Clause. That by itself makes it difficult to conclude that the state court of appeals' decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Desai v. Boo*ker, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

The same result follows here.  Petitioner has failed to demonstrate that the Michigan Court of Appeals determination of his claim regarding the admissibility of the Facebook posts is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief.

VI.    Admissibility of the Expert's Homicide Conclusion (Habeas Issue V)

Finally, Petitioner complains because the forensic pathologist reported a "manner of death" of homicide based on statements to him from others that the victim had been hit intentionally.   Petitioner contends that testimony regarding that ultimate issue—where the testimony was nothing more than the parroting of what non-experts had told the expert—was not proper expert testimony.

The Michigan Court of Appeals flatly rejected Petitioner's challenge:

There is no merit to defendant's argument. Bechinski was qualified as an expert in forensic pathology and performed the autopsy on the victim.  As a forensic pathologist, it was within the proper scope of Bechinski's expert opinion to testify regarding both the cause and manner of death.  See MRE 702; *Unger*, 278 Mich App at 251-252; *People v Yost*, 278 Mich App 341, 395; 749 NW2d 753 (2009). This testimony was not impermissible merely because it embraced the ultimate issue at trial.  See MRE 704; *People v Smith*, 425 Mich 98, 106; 387 NW2d 814 (1986).  Moreover, "an expert witness may rely on hearsay evidence when the

witness formulates an opinion," *People v Lonsby*, 268 Mich App 375, 383; 707 NW2d 610 (2005), meaning that Bechinski's opinion is not objectionable merely because he considered statements made by individuals present at the scene.

However, it is true that, under MRE 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. . . ." The evidence upon which the expert based his opinion may be conditionally received, "subject to the condition that the factual bases of the opinion be admitted in evidence thereafter." MRE 703. According to Bechinski's testimony, his opinion was based on his examination of Berlin's body, which showed injuries consistent with a history of having been intentionally struck by a motor vehicle. Bechinski explained that he had seen other cases where someone used a motor vehicle as a deadly weapon. Thus, his opinion was based in large part on his own observations and experience, and was properly admitted. See MRE 702; MRE 703. We recognize that Bechinski conceded that his opinion of "homicide" was based, in part, on the "circumstances" of the crash that had been reported to him. However, to the extent defendant emphasizes that these circumstances included observations made by witnesses at the scene or facts collected by police, numerous eyewitnesses and police officers testified at trial, meaning that the facts upon which Bechinski based his opinion were admitted into evidence as required by MRE 703.8 Thus, defendant has not shown anything improper in Bechinski's testimony, and counsel did not provide ineffective assistance by failing to object.

Further, defendant has not shown a reasonable probability of a different outcome absent Bechinski's opinion on "homicide." From Bechinski's testimony it is quite clear that his definition of "homicide" was not intended "to carry any legal significance," but was "used for statistical purposes only." In this respect, Bechinski defined homicide as "when one kills another person" through "a volitional act." Given this broad definition, it is clear that Bechinski was not opining that defendant was guilty of first-degree murder, and thus Bechinski's "homicide" classification would not have warranted a first-degree murder verdict, which requires more than a volitional act resulting in death. See generally *Mendoza*, 468 Mich at 534-540; *Bennett*, 290 Mich App at 472. In these circumstances, it does not seem reasonably probable that Bechinski's testimony affected the outcome of the proceedings. Further, the jury was instructed to evaluate expert testimony in the context of the other evidence in the case and that, when assessing expert testimony, they should "think carefully about the reasons and facts that he gave for his opinion and whether those facts are true." "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). The instructions in this case properly informed the jury how to weigh Bechinski's expert opinion, minimizing any potential prejudice. Defendant is not entitled to relief on this basis.

(Mich. Ct. App. Op., ECF No. 7-15, PageID.795-796.)

To the extent Petitioner contends Bechinski's opinion that Berlin's death was a homicide violates the Michigan Rules of Evidence regarding expert testimony, he raises only a state-law claim that is not cognizable on habeas review.  His argument goes beyond that.  He appears to claim the following: (1) it was wrong for the expert to invade the province of the jury by opining the death was a homicide; and (2) it was wrong for the expert to rely on hearsay to reach that conclusion.  Petitioner is wrong as to both claims.

Interpreting the Federal Rules of Evidence, the Supreme Court in *United States v. Johnson*, 319 U.S. 503 (1943), considered the admissibility of expert testimony that was challenged because it "invaded the jury's province." *Id.* at 519.  The court was not troubled by the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

*Johnson*, 319 U.S. at 519-20.  Federal Rule of Evidence expressly states that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  The parallel Michigan Rule of Evidence is virtually identical.  Mich. R. Evid. 704.  Federal Rule of Evidence 704 was passed for the express purpose of abolishing case law that opined witnesses could not express opinions on ultimate issues.  Advisory Committee Notes, Fed. R. Evid. 704.  In *United*

*States v. Scheffer*, 523 U.S. 303 (1998), in a concurring opinion, Justice Kennedy quoted the

Advisory Committee Notes to explain the change:

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information.  7 Wigmore §§ 1920, 1921; McCormick § 12.  The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

That does not leave the permissible scope of expert opinion testimony without

bound.  Federal R. of Evidence 702—and the parallel Michigan rule—requires that the opinion

testimony help or assist "the trier of fact to understand the evidence or to determine a fact in

issue . . . ."  Fed. R. Evid. 702; Mich. Rule Evid. 702.  Expert opinions that "merely tell the jury

what result to reach" would be inadmissible under Rule 702.  Advisory Committee Notes, Fed. R.

Evid. 704.  The Michigan Court of Appeals' analysis makes clear that the expert testimony at issue

here did not tell the jury what result to reach.  To the contrary, the expert made clear that he was

required to identify a manner of death, that he had five choices, that his choice was not meant to

carry any legal significance, and that his conclusion that Berlin's death was a homicide was based

entirely on what others had told him.

If, indeed, the experts here had opined as to Petitioner's guilt, there is some

authority that such opinion testimony would render a trial fundamentally unfair and violate due

process.  *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 287-88 (6th Cir. 1988).  However, *Cooper*

was decided before enactment of the AEDPA.  It expressly relies upon: (1) state court authorities,

rather than federal law as clearly established by the Supreme Court; and (2) the cumulation of

error, a practice the Supreme Court has never held would support habeas relief.  *Scott v. Elo*, 302

F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that

would not individually support habeas relief may be cumulated in order to support relief."). The continuing vitality of *Cooper* after enactment of the AEDPA is questionable. Since enactment of the AEDPA, courts often distinguish the *Cooper* decision. *See, e.g., United States v. Cobb*, 397 F. App'x 128 (6th Cir. 2010); *Arnold v. Palmer*, No. 1:11-cv-840, 2016 WL 4442810 (W.D. Mich. July 25, 2016); *Sanford v. Smith*, No. 2:11-cv-10748, 2013 WL 5913948 (E.D. Mich. Oct. 24, 2013); *Dorsey v. Banks*, 749 F. Supp. 2d 715 (S.D. Ohio 2010). Whatever persuasive force *Cooper* retains, it is not clearly established Supreme Court precedent and, thus, cannot form the basis for habeas relief.

Moreover, if the jurors, upon hearing Dr. Bechinski's testimony, somehow believed that they were bound by the opinion that Berlin's death was a homicide, the jury instructions would have disabused them of that belief. The trial court instructed the jury:

> Experts are allowed to give opinions in court about matters they are experts on. However, you do not have to believe an expert's opinion. Instead, you should decide whether you believe it and how important you think it is. When you decide whether you believe an expert's opinion, think carefully about the reasons and facts that he gave for his opinion and whether those facts are true. You should also think about the expert qualifications, and whether his opinions make sense when you think about all the other evidence in the case.

(Trial Tr. VII, ECF No. 7-11, PageID.748.) On direct review, the state appellate court presumed the jurors followed those instructions. On habeas review, this Court presumes the same. It is clearly established federal law that "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Petitioner's contention that the expert's testimony compromised Petitioner's confrontation rights fares no better. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the

evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).  As noted by the court of appeals, the eyewitnesses whose reports prompted the law enforcement officials to conclude Petitioner hit Berlin intentionally, and the law enforcement officials themselves, all testified. Petitioner had every opportunity to cross-examine them.  Thus, his confrontation rights were not violated.

Petitioner has failed to demonstrate that the state appellate court's determinations of fact regarding the expert's testimony are unreasonable on this record.  Petitioner has also failed to show that the appellate court's legal determinations are contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to

warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated:  January 29, 2019                          /s/ Ray Kent
                                                 United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).